THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| PALACIOS, ELSA KARINA, as the Personal Representative of the ESTATE OF BERNARDO PALACIOS-CARBAJAL,<br><br>Plaintiff,<br><br>v.<br><br>SALT LAKE CITY POLICE DEPARTMENT; OFFICER KEVIN FORTUNA, in an individual and official capacity; OFFICER NEIL IVERSEN, in an individual and official capacity; CHIEF MIKE BROWN, in an official capacity as police chief of the Salt Lake City Police Department; SALT LAKE CITY CORPORATION; and DOE DEFENDANTS 1 THROUGH 10.<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING [29] DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ALL CLAIMS**<br><br>Case No. 2:20-cv-00714-DBB<br><br>District Judge David Barlow<br><br>Magistrate Judge Dustin Pead |

Plaintiff brought this action against the Defendants related to the shooting of Bernardo Palacios-Carbajal. Plaintiff seeks relief under 42 U.S.C. § 1983 and the Utah Constitution for excessive force.[1] The remaining Defendants[2] Neil Iversen, Kevin Fortuna, and Salt Lake City move for summary judgment on all remaining claims.[3] Having considered the briefing and the

---

[1] *See generally*, Complaint, ECF No. 2-1.
[2] The court previously granted motions to dismiss certain claims and defendants. *See* Orders dated March 30, 2021, ECF Nos. 24 & 25.
[3] Defendants' Motion for Summary Judgment on All Claims and Memorandum in Support (Motion), ECF No. 29, filed September 8, 2021.

relevant law, the court concludes Defendants' Motion for Summary Judgment (Motion) may be resolved without oral argument.[4] For the reasons discussed below, the court grants the Motion.

### UNDISPUTED FACTS[5]

On May 23, 2020, a level one priority call was broadcast on the police radio.[6] Dispatch indicated a "threat that had just occurred."[7] Dispatch gave the address of a motel near a club and indicated that the suspect pointed a gun at the caller who was in a room at the motel.[8] Dispatch gave the address again, noted it was Room 3, indicated the incident happened three minutes prior, and gave a description of the suspect as "male, Hispanic adult, 30s, 5'7", all black clothing."[9] Dispatch indicated the suspect told the caller to shut up and pointed a gun at them.[10] The suspect left on foot in an unknown direction.[11]

Within a few minutes after receiving the call, Officer Iversen arrived on the scene and eventually parked in front of a restaurant waiting for another officer.[12] At the same time, Sergeant Schneider also responded to the call.[13] He drove to the scene and asked a man who

---

[4] *See* DUCivR 7-1(g).

[5] When a court considers a summary judgment motion based on qualified immunity, it "usually must adopt the plaintiff's version of the facts, [but] that is not true to the extent that there is clear contrary video evidence of the incident." *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010) (cleaned up) (citing *Scott v. Harris*, 550 U.S. 372 (2007)). However, "in addition to relying on the video, we also continue to view the evidence in the light most favorable to [the non-moving party]." *Id.*

[6] Exhibit C to Motion, Radio Dispatch at 0:40, ECF No. 30-3.

[7] *Id.* at 0:45–0:47.

[8] *Id.* at 0:48–0:54.

[9] *Id.* at 1:23–1:30.

[10] *Id.* at 1:30–1:32.

[11] *Id.* at 1:33.

[12] Exhibit H to Motion, Iversen Body Camera Video at 0:00–0:20, ECF No. 30-8.

[13] *See generally*, Exhibit I to Motion, Schneider Body Camera Video, ECF No. 30-9.

worked at the nearby club if he had seen anyone run by.[14] After speaking to the man, who had not seen anything, Sergeant Schneider drove for about fifteen to twenty seconds.[15]

During this time, a second radio call went out.[16] Dispatch indicated that a second caller reported that two males with guns came into her room, Room 15, at the same motel as the earlier call.[17] One of the officers responding to the call asked for a description of the two suspects.[18] Dispatch provided that the second caller described the suspects as "definitely Hispanic but very light skinned."[19] "Short dark hair is a further description from the first caller."[20] Dispatch then repeated the previous description of "30s, 5'7", all black."[21] Dispatch noted that the caller in Room 3 of the motel was waiting for contact, and the suspect may be outside of the room.[22]

After hearing the calls on the radio, Officer Iversen and another officer walked toward the motel from which the 911 calls had been made.[23] It was a short distance from where the officers had parked their vehicles.[24] Officer Iversen spotted a person standing behind some vehicles near the door of Room 15 and shined a light on him.[25] Officer Iversen and the other officer called out "Hey" and "Show me your hands."[26] Officer Iversen was concerned because he

---

[14] *Id.* at 3:05–3:33.
[15] *Id.* at 3:34–4:00.
[16] Radio Dispatch at 3:57.
[17] *Id.* at 4:00–4:07.
[18] *Id.* at 4:29.
[19] *Id.* at 4:30–4:39.
[20] *Id.* at 4:41–4:43.
[21] *Id.* at 4:44–4:51.
[22] *Id.* at 5:50–5:59.
[23] Iversen Video at 0:48–1:08.
[24] *Id.*
[25] *Id.* at 1:10–1:12.
[26] *Id.* at 1:13.

had received a report that an armed person was just in one of the rooms, and he "wanted to see [the man's] hands."[27]

The man did not respond and began running from the officers.[28] Officer Iversen pursued the man around the motel, down an alley, and eventually across 900 South.[29] While driving, Sergeant Schneider saw the man run by, so he parked, quickly exited his vehicle, and instructed the man three times to "drop it."[30] He began pursuit of the man behind Officer Iversen.[31] Sergeant Schneider indicated twice over the radio that the man had "something in his pocket."[32]

Officer Iversen instructed the man at least two more times to "Show me your hands" during the pursuit.[33] Officers called in the man's description on the radio and indicated they were in pursuit.[34] After a few seconds in pursuit, Sergeant Schneider indicated on the radio that the man had "a gun in his pocket" and was "reaching into his waistband."[35]

When the man tripped and fell a first time, Officer Iversen instructed him four more times to "drop it" and again to "show me your hands."[36] The man continued running with an object in his hands.[37] The man tripped a second time over a curb.[38] Officer Iversen kept instructing the man to "show me your hands" as the man rolled over, with an object still in his hands, and

---

[27] Exhibit G to Motion, Iversen Deposition at 105:23–106:10, ECF No. 30-7.

[28] Iversen Video at 1:14.

[29] *Id.* at 1:15–2:00.

[30] Schneider Video at 4:00–4:05.

[31] *Id.* at 4:06–4:10.

[32] *Id.* at 4:05–4:06.

[33] Iversen Video at 1:20–1:23.

[34] *Id.* at 1:43–1:45.

[35] Radio Dispatch at 6:42–6:44; Schneider Video at 4:34–4:36.

[36] Iversen Video at 1:54–2:00; *see also* Iversen Deposition at 115:11–17 (noting the man had fallen one time prior).

[37] Iversen Video at 1:54–2:00.

[38] Iversen Video at 2:02–2:04; Exhibit O to Motion, Granary Surveillance Video at 0:03, ECF No. 30-15.

continued to run.[39] At this point, Officer Iversen was "99 percent sure that [the man] had a gun and that was a gun in his hand."[40]

As Officer Iversen pursued the man across 900 South, Officer Fortuna, having heard the radio calls, arrived on 900 South in his marked police vehicle, with the lights and siren on.[41] Officer Fortuna testified that he had heard the two dispatch calls and Sergeant Schneider's call on the radio that the man had a gun.[42] Officer Fortuna quickly exited his vehicle and drew his weapon.[43]

Officers Iversen and Fortuna continued yelling numerous times for the man to "show me your hands" and "drop the gun."[44] The man tripped a third time, dropping the gun in his hands.[45] Officer Fortuna testified that he saw the gun.[46] Sergeant Schneider, who was still at least ten yards behind the other officers, running across 900 South, yelled "Tase him, Tase him, Tase him."[47] Neither Officer Fortuna nor Officer Iversen heard Sergeant Schneider say this.[48] As the man tripped the third time, the officers repeatedly ordered the man to "drop it" and "drop the gun."[49] The man stood up, reached down and picked up the gun, and continued to run.[50] As he ran, the man brought both arms in front of his body.[51]

---

[39] Iversen Video at 2:02–2:05; Granary Video at 0:07–0:09.

[40] Iversen Deposition at 118:21–22.

[41] Iversen Video at 2:04; Schneider Video at 4:45–4:47.

[42] Exhibit M to Motion, Fortuna Deposition at 82:12–14, 84:13–85:8, 85:16–21, 87:7–22, ECF No. 30-13.

[43] Exhibit N to Motion, Fortuna Body Camera Video at 1:13–1:15, ECF No. 30-14.

[44] Iversen Video at 2:06–2:08; Fortuna Video at 1:16–1:20.

[45] Iversen Video at 2:06–2:08; Granary Video at 0:09–0:11; Fortuna Video at 1:16–1:20.

[46] Fortuna Deposition at 91:23–24.

[47] Schneider Video at 4:50–4:53; Exhibit J to Motion, Schneider Deposition at 94:12, 22, ECF No. 30-10.

[48] Fortuna Deposition at 95:15; Iversen Deposition at 132:14–16.

[49] Iversen Video at 2:09; Fortuna Video at 1:18–1:21.

[50] Iversen Video at 2:10–2:12; Fortuna Video at 1:19–21; Granary Video at 0:10–0:14.

[51] Fortuna Video at 1:20; Iversen Video at 2:12.

Approximately two to three seconds after the man began running after the third fall, Officers Fortuna and Iversen opened fire on the man.[52] The man fell to the ground on his side and almost immediately began to turn over to face the officers, who continued to shoot at him.[53] As the man turned toward the officers, he brought both hands in front of him, at or below his waist, apparently with something in his hands.[54] The man appeared to be manipulating something in his hands.[55] Officer Iversen testified he continued firing because the man "raised his firearm and pointed it at me."[56] Officer Iversen also testified that he believed the man was "turning to engage" him.[57] Officer Fortuna testified that the "gun was up in a ready position as if trying to locate a target."[58]

Approximately four to five seconds after the officers started shooting, and with sirens in the background, Sergeant Schneider, who was now closer to the officers and the man, put up his hand and yelled.[59] While it is not clear from the video what Sergeant Schneider is yelling, he testified he was yelling "all right."[60] As the man rolled over to face the officers, Sergeant

---

[52] Iversen Video at 2:13; Fortuna Video at 1:23–1:25; Granary Video at 0:14–0:17; Schneider Video at 4:54.

[53] Iversen Video at 2:14–2:20; Fortuna Video at 1:25–1:29; Granary Video at 0:15–0:27.

[54] Iversen Video at 2:15–2:20; Fortuna Video at 1:23–1:27; Granary Video at 0:16–0:24. Plaintiff disputes that Mr. Palacios had a gun in his hand. *See* Plaintiff's Opposition Response to ¶ 63, ECF No. 37, filed October 22, 2021. However, this does not create a genuine dispute of a material fact. First, the referenced video clips support the conclusion that Mr. Palacios had a gun in his hand. *See also* Exhibit P, Southworth Body Camera Video at 0:01–0:10, ECF No, 30-15. Second, the relevant inquiry is not dependent on the officers' accurate assumption that Mr. Palacios had a gun in his hand. *See Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1171 (10th Cir. 2020) ("The salient question is whether the officers' mistaken perceptions…were reasonable. An officer may be found to have acted reasonably even if he has a mistaken belief as to the fact establishing the existence of exigent circumstances." (citation omitted)).

[55] Granary Video at 0:16–0:24.

[56] Iversen Deposition at 142:21–22.

[57] *Id.* at 143:10–12.

[58] Fortuna Deposition at 116:19–20, 117:1–4.

[59] Schneider Video at 4:57–4:59; Granary Video at 0:17–0:19; Fortuna Video at 1:24–1:26.

[60] Schneider Deposition at 103:19–104:11. Sergeant Schneider testified that his "thought process" in saying this was to give the officers "a little insight of—you know, that tunnel vision that possibly comes into the mix of a high-stress

Schneider also drew his weapon and directed it toward the man but did not fire.[61] Sergeant Schneider did not draw his weapon until he could "acquire a sight on the individual" and did so "thinking [the man's] still a threat."[62] Sergeant Schneider testified that the other officers were "more in my way," he did not want to "have an incident from shooting behind the officers," and when Mr. Palacios was on the ground, he was "not specifically more of a threat towards me, as he was towards the officers of where the gun appeared to be angled at."[63]

At the time the last bullet was fired, the man still had both hands in front of him, at or below his waist, apparently holding or manipulating an object.[64] His hands remained extended in front of his body for approximately one additional second after the firing ceased.[65] Then, the man's left arm dropped to his side, and his right hand still hovered around his waist for a brief second, still appearing to hold an object in his hands.[66] The man's right arm then fell to his side, leaving the gun on his upper left thigh.[67] Officer Iversen later testified that he stopped shooting because he "believed the threat was over," not because his "chamber emptied."[68] Over thirty rounds were fired in quick succession over the course of approximately eight seconds.[69] The last shot was fired approximately one second after the other shots.[70]

---

situation shooting like that. So that was not telling the officers that—if they needed to stop or if they needed to continue. It was just to try and see if I could get them to, you know, get out of that tunnel vision, if you will, if they had it, to be of assistance in some regard." *Id.* at 64:12–22.

[61] Schneider Video at 5:02–5:04; Granary Video at 0:19; Iversen Video at 2:18; Fortuna Video at 1:27.

[62] Schneider Deposition at 106:20–107:1.

[63] *Id.* at 107:12–18.

[64] *See* Exhibit K, Synchronized Video at 2:27–2:29, ECF No. 30-11.

[65] *Id.* at 2:29–2:31.

[66] Granary Video at 0:24.

[67] Granary Video at 0:25–0:26; Southworth Video at 0:01–0:04.

[68] Iversen Deposition at 148:9–15.

[69] Fortuna Video at 1:20–1:28; Iversen Video at 2:12–2:20; Schneider Video at 4:54–5:02.

[70] Iversen Video at 2:21–2:22; Fortuna Video at 1:28–1:29; Schneider Video at 5:02–5:03.

Other officers arrived on the scene as the shooting was occurring and within a few seconds after the shooting ceased.[71] After the shooting stopped, two other officers approached the man.[72] The gun was lying on the man's upper left thigh and waist with the handle pointed toward the man's torso.[73] One officer kicked the gun off the man's thigh onto the ground.[74] Another officer kicked the gun away from the man.[75] The man, later identified as Bernardo Palacios-Carbajal, died as a result of the shooting.

About five to six minutes after Mr. Palacios was shot, dispatch further advised there was a report of a robbery in the area involving two men with handguns.[76] The first suspect was described as "male, Hispanic, 20s, black shirt," and the second suspect was described as "male, Hispanic, 20s, red hoodie, red bandana."[77] After confirming Mr. Palacios was wearing black clothing, dispatch put out a call for the remaining suspect with a red hoodie and red bandana with hair in a ponytail.[78]

Both officers who fired their weapons testified they were concerned Mr. Palacios would harm them or others nearby. Based on the information Officer Iversen had, Mr. Palacios had "already committed acts of violence with a lethal weapon."[79] And "allowing that person the

---

[71] *See, e.g.*, Granary Video at 0:12–0:44.

[72] *Id.* at 0:45–0:57.

[73] Southworth Video at 0:01–0:04.

[74] Southworth Video at 0:01–0:10; Granary Video at 0:57–1:03. The Southworth video makes it clear that Mr. Palacios had a gun which he dropped on his upper left thigh.

[75] Southworth Video at 0:01–0:10; Granary Video at 0:57–1:03.

[76] Radio Dispatch 12:08–12:20, 12:34–12:40. The robbery victim's stolen property was found on Mr. Palacios. Exhibit B to Motion, Police Report dated May 23, 2020, SLC 002596–97, ECF No. 30-2. The court notes that the Defendants were not aware of the information about the robbery at the time of the shooting and does not rely on it in analyzing whether the officers acted reasonably.

[77] Radio Dispatch at 12:15–12:20.

[78] *Id.* at 12:49–12:55.

[79] Iversen Deposition at 124:12.

opportunity to carjack somebody or barricade himself in someone's home, to shoot at a responding officer when they're coming into the location, that was not an option for me."[80] Officer Iversen had seen people in the club parking lot, crossing the street to the parking lot.[81] He estimated the number of people to be between fifteen and twenty.[82] Officer Fortuna testified that based on the information he had from the various radio calls and that he saw that Mr. Palacios had a gun and was reaching for it, he believed that Mr. Palacios had "every intention to use that handgun."[83] Officer Fortuna testified he believed there was an imminent threat because Mr. Palacios "picked up the gun intentionally" as if ready to use it, brought it up to his body, and it "looked like he was either up in a ready position or he was trying to manipulate [the gun]."[84] He was concerned about his and Officer Iversen's safety.[85]

## ALLEGEDLY DISPUTED FACTS

Plaintiff has not cited any evidence that creates a genuine dispute of a material fact. As already noted, the court relies on the record evidence and views it in the light most favorable to the non-moving party. It will not accept either party's characterization of the facts that are unsupported or contradicted by the record evidence. The Supreme Court has instructed that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the

---

[80] *Id.* at 124:12–16.
[81] *Id.* at 125:19–23.
[82] *Id.* at 126:20.
[83] Fortuna Deposition at 100:5–14.
[84] *Id.* at 111:21–112:4.
[85] *Id.* at 112:20–21.

record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."[86]

Plaintiff purports to dispute twelve fact paragraphs in Defendants' motion.[87] While the court notes below why those "disputes" do not create a genuine issue of material fact, it must be noted that the court does not, in any event, draw its facts from Defendants' motion, but rather from the record evidence. Additionally, none of these "disputes" create a genuine dispute of material fact as they are either not truly disputed or do not cite any contradictory evidence.[88] Plaintiff also purports to object to certain paragraphs as "self-serving declarations" from the Defendants.[89] The relevant facts here are established without relying on Defendants' declaration testimony. The remaining disputed facts are not material to the court's analysis on the relevant

---

[86] *Scott v. Harris*, 550 U.S. 372, 380–81 (2007); *id.* ("[The Court of Appeals] should have viewed the facts in the light depicted by the videotape.").

[87] Plaintiff's Opposition at 18–20 (purporting to dispute paragraphs 8, 21, 27, 45, 63, 64, 75–78, 85–87 of Defendant's motion).

[88] Paragraph 8 does not create a dispute as to what Officer Iversen testified. Paragraph 21 is not disputed and only adds additional information that the officers did not identify themselves. Paragraph 27 does not cite any contradictory evidence and only claims that the officers' declarations are self-serving. However, as noted, the court does not rely on the officers' declarations, only their depositions. Paragraph 45 does not cite any contradictory evidence about what Officer Iversen believed. Instead, the "dispute" cites to the fact that Mr. Palacios did not ambush the officers. Plaintiff's characterization of paragraph 63 is contradicted by video evidence. The video evidence, especially the Southworth Video, supports the conclusion that Mr. Palacios had the gun in his hand. And that issue is not dispositive of whether the officers acted reasonably. Paragraph 64 is disputed by citing Plaintiff's own recitation of facts relating to the number of shots fired. This does not dispute the facts in Paragraph 64. The video evidence supports that the officers shot Mr. Palacios while his hands were in front of him appearing to hold the gun. Paragraph 75 is disputed only as to the characterization of the distance between Sergeant Schneider and the others. The court relies on the record evidence and not the parties' characterizations of "short distance." Paragraphs 76 and 77 do not cite contrary evidence but add other facts about Sergeant Schneider's actions. Paragraph 78 does not create a dispute as it is another characterization of Sergeant Schneider's actions. Paragraphs 85–87 detail information obtained after the officers shot Mr. Palacios regarding a robbery. As the court has already noted, this information is not relevant to its analysis of whether the officers acted reasonably as they were unaware of it at the time.

[89] Opposition at 20 (objecting to ¶¶ 22, 27–32, 35, 39, 43, 44, 46, 47, 58–61).

issues. Defendants' objections to Plaintiff's statement of facts related to a declaration from an expert are addressed in detail below.

In sum, there are no material disputed facts that prevent this court from determining the motion as a matter of law.

## DEFENDANTS' OBJECTION TO PLAINTIFF'S EXPERT

In opposing the Motion, Plaintiff relies on a declaration from William Harmening.[90] Mr. Harmening has experience as a law enforcement officer and police academy instructor[91] though Defendants assert, and Plaintiff does not contest, that Mr. Harmening has never been qualified by a court as an expert in anything other than securities fraud and has never investigated an officer-involved shooting.[92] Mr. Harmening's declaration is based on his review of the relevant video footage and his opinions on the events depicted in the videos.

As an initial matter, Plaintiff admits that there are portions of the declaration that should be excluded: the first two sentences of paragraph 4 as addressing a legal standard,[93] the first sentence of paragraph 5 as addressing a legal standard,[94] paragraph 11 as within the common knowledge of a juror,[95] paragraph 12 as addressing a legal standard,[96] and the first sentence of paragraph 14 as addressing a legal standard.[97] At issue is whether the remainder of the

---

[90] *See* Opposition at 9–20; Declaration of William Harmening, ECF No. 37-3.
[91] Harmening Declaration at ¶ 1.
[92] *Compare* Defendants' Reply Memorandum (Reply) at 23–27, ECF No. 43, filed December 6, 2021 *with* Plaintiff's Response to Defendants' Objection to the Declaration of William Harmening (Plaintiff's Response) at 9–10, ECF No. 49.
[93] Plaintiff's Response at 2,3; Harmening Declaration at ¶ 4, ECF No. 37-3.
[94] Plaintiff's Response at 3; Harmening Declaration at ¶ 5.
[95] Plaintiff's Response at 11; Harmening Declaration at ¶ 11.
[96] Plaintiff's Response at 11; Harmening Declaration at ¶ 12.
[97] Plaintiff's Response at 11; Harmening Declaration at ¶ 14.

declaration is helpful to the summary judgment analysis. It is not. As just noted, even Plaintiff concedes that the declaration repeatedly and improperly attempts to declare what the law requires. Additionally, the declaration makes multiple statements which are either unsupported or contradicted by the record evidence. A few examples are illustrative.

First, Mr. Harmening opined: "After falling, Palacios remained on his right side for approximately 3 seconds. The officers did not stop shooting while Mr. Palacios was facing away from him [sic], rather they continued to shoot him in the back."[98] This characterization is not supported by the video record. Mr. Palacios fell after being shot and landed primarily on his right side.[99] The video shows that Mr. Palacios did not "remain[] on his right side for approximately three seconds."[100] Instead, after landing, Mr. Palacios immediately moved his legs and upper body in a turning motion.[101] He brought his hands together as he was turning.[102] He oriented his head towards the officers.[103] Approximately three to four seconds after falling to the ground, Mr. Palacios had turned completely onto his back, head lifted, with both arms near or below his waist, appearing to manipulate the gun.[104] Mr. Palacios then spent approximately four or five seconds on his back with his hands near his waist, continuing to appear to steady and manipulate the gun.[105] His left arm next dropped to his side, he lifted up his head a bit more, extended his right hand for a brief second, and then his right arm fell to the ground.[106] The declaration's

---

[98] Harmening Declaration at ¶ 6(e).
[99] Granary Video at 0:15.
[100] *Compare id.* at 0:15–0:18 *with* Harmening Declaration at ¶ 6(e).
[101] Granary Video at 0:15–0:18.
[102] *Id.* at 0:17–0:18.
[103] *Id.* at 0:15–0:18.
[104] *Id.* at 0:19–0:24.
[105] *Id.* at 0:19–0:24.
[106] *Id.* at 0:24–0:26.

suggestion that Mr. Palacios was shot in the back while motionless is "blatantly contradicted"[107] by the video evidence.

Second, Mr. Harmening opined:

The surveillance video does not support that Palacios was holding a gun. Although a gun was found on Palacios' lap, it is likely that the gun had been pressed against his body after he fell. The gun on the lap is not visible in the body cam videos or the surveillance video.[108]

This is statement is also "blatantly contradicted"[109] by the totality of the video evidence. As just discussed, Mr. Palacios fell to the ground after being shot, landing on his right side.[110] There is no evidence that the gun was ever under him. And if, as Mr. Harmening speculates, the gun was under Mr. Palacios as he lay on his right side, it could not have made its way on its own from being pinned under his *right* side to his *left* upper thigh. Even if it were somehow possible for a heavy object like a gun to be stuck to a person as they rolled—something which Mr. Harmening does not attempt to address, there is simply no way for the gun to move by itself from under Mr. Palacios' *right side* to his *left upper thigh*.

Here is what the video record actually shows. Mr. Palacios began to turn almost immediately after falling to the ground on his right side.[111] Over the course of a few seconds, he turned onto his back, facing the officers, with both hands extended in front of him at or just below his waist.[112] He appeared to be gripping something right around his waist level.[113] His

---

[107] *Scott v. Harris*, 550 U.S. at 380–81.
[108] Harmening Declaration at ¶ 9.
[109] *Scott v. Harris*, 550 U.S. at 380–81.
[110] Granary Video at 0:16.
[111] *Id.* at 0:15–0:20.
[112] *Id.* at 0:19.
[113] *Id.* at 0:20.

hands remained together in this position for approximately four seconds while manipulating the object.[114] At that point, Mr. Palacios put his left arm down to his side and appeared to lift his upper body.[115] His right hand was still in front of his body at approximately waist level.[116] His right hand then fell to his right side.[117] In uninterrupted video, an officer then approached Mr. Palacios, with the gun clearly visible on his upper left thigh, the same area where the video showed his hands had been only seconds before.[118] While some of the video quality is poor, the only possible conclusion is that as Mr. Palacios rolled from his right side to his back, he brought the gun with his hand up to his waist, steadied and manipulated the gun with both hands, and then eventually dropped it onto his upper left thigh as he was shot. Mr. Harmening's speculative opinion is contradicted by the video evidence.

Third, Mr. Harmening opined:

The Surveillance video of the Granary Storage does not depict that a gun was in Palacios' hand as he rolled over after being shot in the back multiple times. Even a magnification of the video does not provide clarification. Based on my years of experience observing shooting scenarios, it is plausible, if not likely, that Palacios was rolling over and holding his hands up to protect himself from the shooting and/or to indicate a surrender.[119]

Again, this is not supported by the video record. The record in this case comprises not just one video, but multiple videos, which must be considered together. The video shows that Mr. Palacios had both hands extended in front of his body and appeared to grip an object at or

---

[114] *Id.* at 0:20–0:24.
[115] *Id.* at 0:24–0:25.
[116] *Id.* at 0:24–0:25.
[117] *Id.* at 0:24–0:26.
[118] *See* Southworth Video at 0:01–0:04; *see also* Granary Video at 0:57–1:01.
[119] Harmening Declaration at ¶ 8.

just below waist level.[120] His hands are not moving up or in a manner that is associated with surrender. Furthermore, Mr. Palacios' gun was "a 1911 model single-action pistol that requires that the slide be manually 'racked' for it to be ready to fire."[121] The video shows that Mr. Palacios' hands appeared to be manipulating the gun consistent with operating a slide on a gun, not surrendering.[122] At no time does Mr. Palacios put up his hands.[123]

Finally, Mr. Harmening repeatedly speculated about what Mr. Palacios might have been doing rather than attempting to shoot the officers.[124] But that is not the relevant test. The test is whether the officers' actions were objectively reasonable. Even if the court accepted Mr. Harmening's speculations that Mr. Palacios was not pointing the gun at the officers, that he was attempting to surrender, or that the gun somehow moved from pinned under his right side to his left waist on its own as he rolled over, these would not be dispositive of the issue. The relevant inquiry would still be whether a reasonable officer would have used force in that situation, even if based on a mistake of fact.[125]

Mr. Harmening's declaration does not and cannot create any facts not already in the record. Instead, the declaration simply characterizes the facts according to Mr. Harmening's point of view. To that end, the declaration is unhelpful as the court has reviewed all the video

---

[120] Granary Video at 0:20.

[121] Harmening Declaration at ¶ 4(i).

[122] *See* Granary Video at 0:18–0:23.

[123] *See id.*; *see also* Iversen Video at 2:12–2:20; Fortuna Video at 1:20–1:29.

[124] *See, e.g.*, Harmening Declaration at ¶¶ 4 (opining that Mr. Palacios was attempting to escape and not use violence), 4(a) (opining that Mr. Palacios did not know he was being confronted by police), & 8 (opining that Mr. Palacios was trying to indicate a surrender).

[125] *See Estate of Smart*, 951 F.3d at 1171 ("The salient question is whether the officers' mistaken perceptions that [the suspect] was the shooter were reasonable. An officer may be found to have acted reasonably even if he has a mistaken belief as to the facts establishing the existence of exigent circumstances." (citations omitted)).

and audio evidence. Furthermore, as Plaintiff has acknowledged, Mr. Harmening's declaration cannot supply the meaning of the law or reach legal conclusions. For these reasons, the declaration is unhelpful to the summary judgment analysis.[126]

## LEGAL STANDARD

Courts are to resolve the "purely legal question raised by a qualified immunity defense at the earliest possible stage."[127] Summary judgment is granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[128] A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[129] In determining whether there is a genuine dispute of material fact, the court should "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant."[130] And "[a]lthough the reasonableness standard is inevitably fact dependent, it should not be reserved for the jury in the absence of disputed material facts."[131]

## DISCUSSION

### I.   Defendants Iversen and Fortuna Are Entitled to Qualified Immunity.

When an officer asserts qualified immunity in a § 1983 claim, the "heavy burden" shifts to the plaintiff to show (1) a violation of a constitutional right and (2) that the right was

---

[126] Defendants ask the court to exclude Mr. Harmening's declaration in its entirety. Reply at 23–27. Because the court finds that the declaration does not create a genuine issue of material fact, it is unnecessary to determine whether Mr. Harmening could offer any of his opinions at trial.

[127] *Medina v. Cram*, 252 F.3d 1124, 1127–28 (10th Cir. 2001) (cleaned up) (citations omitted).

[128] Fed. R. Civ. P. 56(a).

[129] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[130] *Id.*

"clearly established."[132] The court has discretion to determine which of these prongs to address first "in light of the circumstances in the particular case."[133] If the plaintiff establishes both of these prongs, "the burden shifts to the defendant, who must prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law."[134]

### a. Plaintiff Has Not Shown a Constitutional Violation.

In analyzing whether a constitutional violation has occurred, the court is to consider the three *Graham* factors: (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight."[135] The Tenth Circuit has held that the "*Graham* framework allows the use of deadly force where 'a reasonable officer...would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others.'"[136]

Excessive force claims are generally reviewed under a "relatively exacting 'objective reasonableness' standard."[137] Courts are to assess "the reasonableness of an officer's conduct from the perspective of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances."[138] The analysis is "undertaken from 'the perspective of a reasonable officer on the scene, rather than with the 20/20

---

[132] *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005).

[133] *Borneman v. Rozier*, 398 Fed. App'x 415, 418 (10th Cir. 2010).

[134] *Medina*, 252 F.3d at 1128 (internal quotation marks and citations omitted).

[135] *See Graham v. Connor*, 490 U.S. 386, 396 (1989).

[136] *Estate of Smart*, 951 F.3d at 1171 (citation omitted).

[137] *Porro v. Barnes*, 624 F.3d 1322, 1325 (10th Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386 (1989)).

[138] *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1220 (10th Cir. 2005).

vision of hindsight.'"[139] The end inquiry "is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force."[140]

As noted earlier, an "officer may be found to have acted reasonably even if he has a mistaken belief as to the facts establishing the existence of exigent circumstances."[141] In that case, "[t]he salient question is whether the officers' mistaken perceptions that [the defendant] was the shooter were reasonable."[142] Officers "need not await the 'glint of steel' before taking self-protective action; by then, it is 'often…too late to take safety precautions.'"[143]

i.   The shooting is analyzed as one event under the totality of the circumstances, not as two separate events.

As an initial matter, the court addresses Plaintiff's argument that it should conduct separate analyses of the shooting officers' initial decision to open fire and the decision to continue shooting when Mr. Palacios fell to the ground. [144] The Supreme Court has clearly and unambiguously instructed courts to consider the totality of the circumstances.[145] The "totality of circumstances requires courts to consider 'the whole picture.'"[146] The Supreme Court counseled that its "precedents recognize that the whole is often greater than the sum of its parts—especially when the parts are viewed in isolation."[147] The Court has criticized lower courts for taking facts one by one instead of as a whole and concluded, the "totality-of-the-circumstances test

---

[139] *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 780 (10th Cir. 1993) (citation omitted).
[140] *Estate of Larsen ex re. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).
[141] *Estate of Smart*, 951 F.3d at 1171.
[142] *Id.*
[143] *Estate of Larsen*, 511 F.3d at 1260 (citation omitted).
[144] Opposition at 5, 24.
[145] *See Tennessee v. Garner*, 471 U.S. 1, 9 (1985).
[146] *District of Columbia v. Wesby*, -- U.S.--,138 S. Ct. 577, 588 (2018).
[147] *Id.*

'precludes this sort of divide-and-conquer analysis.'"[148] And the Tenth Circuit has stated specifically with regards to qualified immunity, "It is the *totality of the circumstances* that is the touchstone of the reasonableness inquiry. 'Strict reliance' on the 'precise moment' factor is inappropriate when the totality must be considered."[149] Nevertheless, the court considers the cases Plaintiff cites in support of the proposed "segmented analysis."

Plaintiff relies on three Tenth Circuit cases: *Fancher v. Barrientos*,[150] *Estate of Smart v. City of Wichita*,[151] and *Reavis Estate of Coale v. Frost*.[152] These cases are distinguishable and do not, in any event, require a segmented analysis. First, in *Fancher*, the Tenth Circuit determined it did not have jurisdiction to hear an attack on the district court's segmented analysis.[153] The appealing officer argued that the district court erred in analyzing the first shot he fired separately from shots two through seven.[154] The officer framed this as a "misapplication of the totality of the circumstances standard."[155] The Tenth Circuit noted that this was a "challenge to the facts the district court concluded a reasonable jury could infer based upon the evidence in the summary judgment record."[156] The officer did not challenge the district court's reliance on case law but argued "that the circumstances of *this* case are not amenable to such analysis."[157] Contrary to Plaintiff's argument, the Tenth Circuit did not affirm the segmented analysis but instead

---

[148] *Id.* (citation omitted).
[149] *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1318 (10th Cir. 2009) (emphasis added).
[150] 723 F.3d 1191 (10th Cir. 2013).
[151] 951 F.3d 1161 (10th Cir. 2020).
[152] 967 F.3d 978 (10th Cir. 2020).
[153] 723 F.3d 1191, 1200 (10th Cir. 2013).
[154] *Id.* at 1199.
[155] *Id.*
[156] *Id.*
[157] *Id.* at 1200 (emphasis in original).

concluded that it did not have jurisdiction to hear the attack on the segmented analysis.[158] *Fancher* does not require a segmented analysis.

Plaintiff then discusses *Estate of Smart*, but nothing in that analysis appears to point to why a segmented analysis is appropriate.[159] In that case, an officer ran after and fired one shot at a man he suspected of shooting into a crowd leaving a concert.[160] Another nearby officer heard four or five shots and saw a man running in a way he believed was indicative of fleeing from the police.[161] The second officer then heard two or three more shots, and the man who had been running fell to the ground. The second officer then shot the man on the ground two or three more times.[162] There was evidence of a five-second gap between the shots fired by the second officer.[163] After summarizing the case, Plaintiff notes that in analyzing the "clearly established" prong, the Tenth Circuit concluded that the officer violated clearly established law by shooting the man after it was clear he posed no threat.[164] This conclusion applied to the officer who fired the last shots but was not the result of segmented analysis. Rather, it addressed the actions of the two officers who were in different locations and fired at different times.[165] Here, both officers fired at almost exactly the same time, within a few feet of each other, and had very similar vantage points and underlying information regarding Mr. Palacios.

---

[158] *Compare id.* (concluding the court did not have jurisdiction to hear an appeal on whether the district court properly segmented the analysis) *with* Opposition at 24–25 (stating three times that the *Fancher* court affirmed that the district court correctly applied a segmented analysis).
[159] Opposition at 25–26.
[160] 951 F.3d at 1166.
[161] *Id.*
[162] *Id.* at 1167.
[163] *Id.*
[164] *Id.* at 1175.
[165] *See id.* at 1166–67.

Finally, Plaintiff cites to *Reavis* as support that courts consider "the precise moment the officer used force."[166] There, the issue was whether an officer's shooting of a suspect after he drove past the officer was excessive force.[167] It is unclear what support Plaintiff thinks this provides for conducting a segmented analysis. *Reavis* focused on the "clearly established" prong of the qualified immunity analysis and concluded that it was clearly established that using force against a subdued suspect is unlawful.[168] The *Reavis* court did not engage in a segmented analysis.[169]

At least one previous opinion in this district has rejected requests for segmented analysis.[170] Citing the Supreme Court, the court noted, "Dividing 'tense, uncertain, and rapidly evolving' circumstances into separate segments for a hermetically sealed, segment-by-segment analysis in the manner proposed by [plaintiff] smacks of the '20/20…hindsight' analysis 'in the peace of a judge's chambers' barred by *Graham*" and would "turn the analysis prescribed by the Supreme Court on its head."[171]

In this case, the events transpired quickly. From the time Mr. Palacios started running to the moment the officers began firing was approximately sixty seconds.[172] The shooting lasted approximately eight seconds.[173] All of the shots were fired in quick succession, with the longest gap being one second.[174] Mr. Palacios fell to the ground after being shot and immediately turned

---

[166] Opposition at 26 (quoting *Reavis*, 967 F.3d at 989) (emphasis in original).
[167] *Reavis*, 967 F.3d at 985–92.
[168] Opposition at 27.
[169] *See generally Reavis*, 967 F.3d at 985–92.
[170] *See Hinkley v. Salt Lake City Corporation*, 426 F. Supp. 3d 1207, 1216 (D. Utah 2019).
[171] *Id.* at 1217.
[172] Iversen Video at 1:14–2:13.
[173] *Id.* at 2:13–2:21.
[174] *Id.* at 2:13–2:21.

over, arms in front of him, apparently with the gun in his hands, and facing the officers.[175]

Trying to separate the totality of these events and view them in a segmented manner would be

unhelpful, distortive, and contrary to precedent. Based on the mandates from the Supreme Court

and Tenth Circuit, the court is to consider the totality of the circumstances in this case, including

all events leading up to the shooting and during the shooting. On the facts of this case, this

results in one analysis, not segmented analyses of an alleged "initial" shooting and an alleged

"continued" shooting.[176]

> ii.   The officers had probable cause to believe that Mr. Palacios had committed
> serious felonies.

The Tenth Circuit has determined that the first *Graham* factor, the severity of the crime at

issue, weighs against a plaintiff claiming a constitutional violation "when the crime at issue is a

felony, irrespective of whether that felony is violent or nonviolent."[177] Here, at the relevant time,

Mr. Palacios was suspected of committing not one felony, but two, and both were violent.[178]

Based on two dispatch calls, Mr. Palacios was suspected of threatening multiple victims with a

gun and entered the second caller's room in potentially an attempted robbery or burglary.[179]

Robbery and aggravated robbery are felonies under Utah law.[180] Burglary and aggravated

burglary are also felonies.[181] Plaintiff does not address this factor or respond to Defendants'

---

[175] Granary Video at 0:15–0:23; Southworth Video at 0:01–0:04.

[176] While a segmented analysis is neither required nor appropriate here, it must be noted that it would not change the result. Neither what Plaintiff terms the "initial shooting" nor the "continued shooting" resulted in a violation of constitutional rights. And relevant case law would not have made it clear to "every reasonable offic[er]" that their actions were unlawful. *Ashcroft v. al-Kidd*, 563 U.S. at 741.

[177] *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021).

[178] *See* Utah Code § 76-3-203.5(1)(c)(i)(AA) & (BB).

[179] Radio Dispatch at 0:45–1:33, 3:57–5:59.

[180] *See* Utah Code §§ 76-6-301, -302.

[181] *See* Utah Code §§ 76-6-202, -203.

arguments addressing this factor, thereby conceding the issue. This factor weighs against a constitutional violation.

### iii.   The officers had probable cause to believe that Mr. Palacios posed an immediate threat to their safety and the safety of others.

According to *Graham*, the threat posed by a suspect claiming a constitutional violation is "undoubtedly the most important and fact intensive factor" for consideration.[182] When the court assesses "whether a suspect poses an immediate threat permitting the use of deadly force, [the court] consider[s] the totality of the circumstances from the perspective of a reasonable officer."[183] The Tenth Circuit has provided four factors, known as the *Larsen* factors, to help evaluate the degree of threat perceived by the officer: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect, and (4) the manifest intentions of the suspect."[184]

#### 1.   *Mr. Palacios repeatedly ignored orders to drop his weapon and show his hands.*

It is undisputed that multiple officers instructed Mr. Palacios to drop his weapon and show his hands numerous times.[185] The Tenth Circuit has "treated orders to drop a weapon, an order [the officer] provided, as sufficient warning when '[e]vents were unfolding extremely quickly.'"[186] All of these events took place in a short amount of time, with multiple officers

---

[182] *Reavis*, 967 F.3d at 985.

[183] *Estate of Taylor v. Salt Lake City*, 16 F.4th 744, 765 (10th Cir. 2021).

[184] *Id.* at 765 (quoting *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255 (10th Cir. 2008)).

[185] *See* Schneider Video at 4:00–4:05; Iversen Video at 1:54–2:00, 2:09; Fortuna Video at 1:18–1:21.

[186] *Samuel v. City of Broken Arrow, Okla.*, 506 Fed. App'x 751, 754 (10th Cir. 2012); *see also Thomson*, 584 F.3d at 1318–19.

pursuing Mr. Palacios. It is undisputed that Mr. Palacios tripped three times, and each time got up, with his gun, and continued to run.[187] The officers gave numerous commands to drop the weapon and show his hands.[188] Mr. Palacios ignored these commands by keeping the gun with him after he tripped three times and continuing to run.[189] This factor weighs against a constitutional violation.

> ### 2.   *Mr. Palacios made hostile motions toward the officers with a weapon.*

Mr. Palacios exhibited at least two hostile motions with his gun toward the officers. First, Mr. Palacios retrieved his gun three times after tripping and kept it with him as he ran from the officers.[190] A reasonable officer certainly could interpret a suspect's desire to maintain a gun with him, after three opportunities to abandon the gun, as a hostile motion and as demonstrating an intent to use the weapon. Second, a reasonable officer could believe that while on the ground, Mr. Palacios turned to face the officers and pointed his gun at them. As Mr. Palacios fell to the ground after being shot, almost immediately he began to turn over facing the officers.[191] He had both hands extended in front of his body and appeared to grip an object at approximately the level of his waist.[192] His hands appeared to be manipulating something.[193] The officers had been

---

[187] Iversen Video at 1:54–2:09; Granary Video at 0:02–0:11; Fortuna Video at 1:12–1:20.

[188] Iversen Video at 1:13–2:09; Fortuna Video at 1:14–1:20.

[189] Iversen Video at 1:13–2:09; Fortuna Video at 1:14–1:20.

[190] Iversen Video at 1:57–2:12.

[191] Granary Video at 0:16–0:18. Plaintiff's characterization that "Bernardo remained on his right side for 3 seconds" is contradicted by the video. Opposition at 33.

[192] Granary Video at 0:20. The court cannot accept Plaintiff's argument that Mr. Palacios "was rolling over and holding his hands up to protect himself from the shooting and/or to indicate a surrender" as it is contradicted by the video evidence. *Compare* Opposition at 35 *with* Granary Video at 0:16–0:24 *and* Southworth Video at 0:01–0:04 (showing the gun on Mr. Palacios' body where his hands had been only a few seconds before).

[193] Granary Video at 0:20–0:24.

told by dispatch that the suspect had a gun and had just threatened multiple people with it, had seen Mr. Palacios with the gun, watched Mr. Palacios pick up the gun multiple times,[194] and reasonably believed he was pointing it at them.[195] They continued firing at Mr. Palacios while they reasonably believed the gun was pointed at them.[196] As it turned out, the officers were right: the videos taken together, and the Southworth video in specific, confirm that Mr. Palacios had a gun in his hand, pointed toward the officers, which he eventually dropped onto his upper left thigh after the shooting ceased.[197]

In *Thomson v Salt Lake County*, the Tenth Circuit determined lethal force was reasonable in part because the suspect had been ordered to drop the gun and did not comply.[198] The man aimed his weapon at the officers and had previously stated he was going to pull the trigger.[199] During a short amount of time, the man put the gun in his mouth, "and that immediately before he was shot, the gun was pointed upwards, near and toward [the man's] head."[200] The court noted it "would have been virtually impossible for the [deputy] to ascertain whether [the man's] gun was simply moving upward or it was coming down to be aimed at him again. [The deputy]

---

[194] Officer Iversen observed Mr. Palacios trip three times and retrieve his gun. *See* Iversen Video at 1:55–2:12; *see also* Iversen Deposition at 115:11–17. Officer Fortuna observed at least Mr. Palacios' last trip and saw him retrieve the gun. *See* Fortuna Deposition at 91:20–92:1; Fortuna Video at 1:14–1:18.

[195] *See* Fortuna Video at 1:15–1:30; Fortuna Deposition at 111:20–112:6; Iversen Video at 1:14–2:14; Iversen Deposition at 140:4–6, 143:2–12.

[196] Again, Plaintiff's characterization that "the officers did not stop shooting while Bernardo was facing away from them on the ground; rather they continued to shoot him in the back" is contradicted by the video evidence. *Compare* Opposition at 33 *with* Granary Video at 0:16–0:24.

[197] Southworth Video at 0:01–0:05; Granary Video at 0:15–0:26; Iversen Video at 2:14–2:20; Fortuna Video at 1:21–1:29.

[198] 584 F.3d 1304, 1319 (10th Cir. 2009).

[199] *Id.*

[200] *Id.* at 1311.

was forced to make a split-second decision."[201] And, the court stated that "a reasonable but mistaken belief that a suspect is going to fight back with force would justify the use of deadly force on these facts."[202]

Similarly, the video and audio evidence here show that the officers ordered Mr. Palacios to drop the gun or show his hands at least ten times.[203] The video evidence shows Mr. Palacios retrieved his gun from the ground three times. Then, after Mr. Palacios was shot and fell to the ground, the video shows that he brought his hands in front of him over his waist and appeared to grip and manipulate the gun, which later was found lying on his upper left thigh.[204] It is reasonable for officers to assume that a man who has ignored repeated commands to drop the gun, had previously threatened multiple people with the gun, and who had turned to face them while appearing to hold the gun in his hands, was making a hostile motion toward the officers.[205] Ample Tenth Circuit case law instructs that an officer does not have "to wait to be shot at or even see [the suspect] raise a gun and point it at him before it would be reasonable for [the officer], under these circumstances, to shoot [the suspect]."[206]

---

[201] *Id.* at 1319.

[202] *Id.*

[203] *See generally*, Iversen Video; Fortuna Video; Schneider Video.

[204] *See* Granary Video at 0:14–0:25; Southworth Video at 0:01–0:04.

[205] Furthermore, the Southworth Video evidence makes clear that the officers' belief was correct that Mr. Palacios was holding the gun and attempting to manipulate it while pointing it at them. The gun was found on Mr. Palacios' upper left thigh near where his hands had been only seconds before. Granary Video at 0:14–0:25; Southworth Video at 0:01–0:04.

[206] *Phillips v. James*, 422 F.3d 1075, 1078 (10th Cir. 2005); *see also Estate of Valverde by and through Padilla v. Dodge*, 967 F.3d 1049, 1062 (10th Cir. 2020) ("Perhaps a suspect is just pulling out a weapon to discard it rather than to fire it. But waiting to find out what the suspect planned to do with the weapon could be suicidal.").

Next, Plaintiff argues that because one officer, Sergeant Schneider, did not fire at Mr. Palacios, the other two officers who did acted unreasonably.[207] Plaintiff points to three of Sergeant Schneider's actions to suggest that the other officers' actions were not objectively reasonable: (1) yelling "tase him," (2) yelling "all right" approximately four seconds after the officers started firing, and (3) putting his hand up as he is yelling "all right."[208]

As Plaintiff notes, the court conducts its analysis "from the perspective of a reasonable officer *on the scene*."[209] While Sergeant Schneider raced to catch up with Officers Iversen and Fortuna, he was not similarly situated to them so as to be considered a reasonable officer "on the scene." His decision not to shoot does not mean the other officers' decision was not objectively reasonable.

When Sergeant Schneider yelled "tase him, tase him, tase him" he was running across 900 South and was still many feet away (at least thirty) from Officer Fortuna, Officer Iversen, and he was even further from Mr. Palacios.[210] Specifically, Sergeant Schneider testified that he was anywhere from ten to twenty-five yards away from the officers at this time.[211] The video confirms that Sergeant Schneider is far from the officers when he yelled.[212] He had not seen Mr. Palacios retrieve the gun and thought that using a Taser could have been appropriate if Mr. Palacios "was separated from the gun."[213] But, as he testified, "I obviously could not see what

---

[207] Opposition at 30–33, 41–43.

[208] *See* Opposition at 30–33, 41–43.

[209] *George v. Newman*, 726 Fed. App'x 699, 704 (10th Cir. 2018).

[210] Synchronized Video at 2:14; Schneider Video at 4:48–4:50.

[211] Schneider Deposition at 94:12, 22–23.

[212] Synchronized Video at 2:14; Schneider Video at 4:48–4:53.

[213] Schneider Deposition at 94:8–9.

they saw."[214] So, Sergeant Schneider did not have the same information that Officers Iversen and Fortuna had: namely that Mr. Palacios had repeatedly retrieved his gun and had it in his hand. Sergeant Schneider also testified that he "can throw out a suggestion, but that doesn't mean that they have to follow that order."[215]

Sergeant Schneider further clarified that he did not believe that if he were in the officers' position, he would have tased Mr. Palacios. This is because he did not have the same information as Officers Iversen and Fortuna. Schneider testified, "I have no idea what they're seeing, so, I could not say I would do the same thing. I can't even say if that would be an option."[216] And, again Sergeant Schneider noted that "depending upon what the officers were seeing, that's what they go off of."[217] Contrary to Plaintiff's assertion, the record does not support that Sergeant Schneider was giving an order the officers were required to follow. Sergeant Schneider testified that the appropriate action is dependent on what the officers saw.[218]

Next, contrary to Plaintiff's characterization, Sergeant Schneider was not "nearly shoulder to shoulder with the officers when the shooting began."[219] When the shooting began, Sergeant Schneider was still behind and to the right of Officers Fortuna and Iversen.[220] He also testified that Officers Iversen and Fortuna were "blocking me to some degree," and he "could not see a hundred percent of what [Mr. Palacios] was doing."[221] And Sergeant Schneider was

---

[214] *Id.* at 94:13.

[215] *Id.* at 98:5–7.

[216] *Id.* at 96:9–11.

[217] *Id.* at 96:14–15.

[218] *Id.*

[219] Opposition at 32.

[220] Synchronized Video at 2:19; Schneider Video at 4:53–4:55; Schneider Deposition at 94:12–13 ("But once again, I was 10, 15 yards behind them, the officers, and I obviously could not see what they saw.").

[221] Schneider Deposition at 67:15–24.

running, not stationary like Officers Iversen and Fortuna.[222] So, not only was Schneider not

"nearly shoulder to shoulder" with the shooting officers, he was differently situated than them:

he was further away, was running and not stationary, had a partially obstructed view, and had not

seen Mr. Palacios retrieve his gun. Not only does Sergeant Schneider offer this uncontradicted

testimony, but his body camera confirms it.[223] Sergeant Schneider could not see what Officers

Iversen and Fortuna were seeing.[224]

Sergeant Schneider also testified that yelling "all right" was not telling the officers "if

they needed to stop or if they needed to continue."[225] Sergeant Schneider testified that when he

said "all right" he knew that "what I say has no [e]ffect on what they're seeing still."[226] So, the

argument that Sergeant Schneider yelling "all right" or putting up his arm was somehow a

command for the officers to stop firing is not supported by the record. In any event, both

shooting officers testified that they did not see Sergeant Schneider put up his arm[227]—they

would not have since the video shows them focused on Mr. Palacios with Sergeant Schneider

behind and to the side of them[228]—and did not hear Sergeant Schneider saying anything.[229]

---

[222] Schneider Video at 4:53–4:56; Fortuna Video at 1:17–1:29; Iversen Video at 2:10–2:21.

[223] *See* Schneider Deposition at 67:15–24, 92:21–23, 94:12–13, 96:9–15; Schneider Video at 4:00–5:04.

[224] Schneider Deposition at 92:21–23 ("[T]he gap that was between us that I could not see, obviously, being as far back, what they were seeing.").

[225] Schneider Deposition at 64:18–19.

[226] *Id.* at 69:4–6.

[227] Fortuna Deposition at 95:24–25; Iversen Deposition at 147:18–20.

[228] Granary Video at 0:15–0:20; Fortuna Video at 1:20–1:28; Iversen Video at 2:13–2:21; *see also* Fortuna Deposition at 96:5–9.

[229] Fortuna Deposition at 95:21–23, 108:24–109:2; Iversen Deposition at 136:19–21, 145:5–13.

Plaintiff relies on *Estate of Booker v. Gomez*[230] to argue that Sergeant Schneider's choice not to use force is determinative of reasonableness.[231] This reliance is misplaced. The issue in *Booker* was whether the court could analyze the behavior of a group of officers rather than analyze each defendant officer's behavior individually. A man was arrested, and while being processed, several deputies restrained him, which eventually led to his death. There were multiple disputed facts as to whether the man was resisting. The Tenth Circuit affirmed the district court's denial of qualified immunity based on the disputed facts. The defendants there argued their conduct should be viewed separately, but the Tenth Circuit disagreed that individual analysis was necessary.[232] The court noted times when it analyzed the conduct of multiple defendants individually and collectively.[233] It noted that "we have analyzed officer action individually, but we have still denied qualified immunity when an officer failed to prevent others from using excessive force even though the officer himself did not engage in excessive force."[234]

The district court did not err in not conducting an individualized analysis because the defendants "actively and jointly participated in the use of force," and "even if a single deputy's participation did not constitute excessive force, that deputy could be liable under a failure-to-intervene theory."[235] Because each defendant in *Booker* would be liable for either participating in the excessive force or failing to stop the other officers' use of force, it was appropriate for the court to analyze the officers' actions as a whole. That situation is not relevant here. Sergeant

---

[230] 745 F.3d 405 (10th Cir. 2014).
[231] Opposition at 39.
[232] 745 F.3d at 421.
[233] *Id.*
[234] *Id.*
[235] *Id.* at 422.

Schneider is not a defendant and is not potentially liable for failure to intervene. *Booker* does not support Plaintiff's argument that Sergeant Schneider's actions preclude a finding that the shooting officers' actions were objectively reasonable.

The present facts are more like those in *Valverde*, where the plaintiff made a similar argument against one officer when none of the five other SWAT members fired at the suspect.[236] That plaintiff argued that the decision by the other officers not to fire provided "circumstantial evidence that a reasonable officer would not have believed [the suspect] to be an immediate threat of death or serious bodily injury."[237] The Tenth Circuit confirmed that "the issue is whether a reasonable officer in [*the officer's*] *position* would have believed [the suspect] was armed and dangerous."[238] Two of the officers were to the suspect's left and did not see the gun in his hand.[239] The K-9 officer was "further back but did not see a gun" in the suspect's hand.[240] Another officer did not see the suspect until after the shooting.[241] Yet another officer saw the suspect with the gun, but was "crouching down on the sidewalk and was in no position to fire."[242] In the end, the defendant officer "was the only officer besides Rodriguez who saw [the suspect] draw his gun, and [the defendant] was facing [the suspect] at the time; the failure of the other officers to fire is of little relevance."[243]

---

[236] *Valverde*, 967 F.3d at 1065.

[237] *Id.* at 1065.

[238] *Id.* (emphasis in original).

[239] *Id.*

[240] *Id.*

[241] *Id.*

[242] *Id.*

[243] *Id.*; *see also Estate of Larsen*, 511 F.3d at 1263 n.4 (determining that the fact that another officer on the scene did not fire at the suspect did not "provide any support" for the argument that the defendant-officer's actions were unreasonable).

In sum, while Sergeant Schneider was close by and hurrying to the scene, he was not similarly situated to Officers Iversen and Fortuna. He was further away, running to catch up, did not know that Mr. Palacios had just retrieved his gun, and had his view partially blocked. Because the information and view he had was much different and worse than that of Officers Iversen and Fortuna, his actions are not helpful in assessing what a reasonable officer on the scene would do considering a totality of the circumstances. The video evidence is conclusive. Therefore, this factor weighs against a constitutional violation.

### 3. There was a short distance separating the officers and Palacios.

As shown in the videos, there was a short distance separating the shooting officers from Mr. Palacios. The officers' testimony further supports that the distance between them and Mr. Palacios was fifteen to twenty feet.[244] Because of the proximity between the armed suspect and the shooting officers, this factor weighs against a constitutional violation.

### 4. Mr. Palacios' manifest intentions.

Plaintiff argues that Mr. Palacios' actions demonstrated he desired to flee rather than use his weapon.[245] First, Plaintiff argues Mr. Palacios did not know he was being confronted by the police.[246] The Tenth Circuit has noted that the case law does not "stand for the proposition that officers must identify themselves; rather, they stand for the proposition that it must be objectively reasonable for an officer to believe the suspect knew he was an officer before requiring compliance."[247] In *Emmett*, the Tenth Circuit concluded that even though the officer

---

[244] Iversen Deposition at 135:19; Fortuna Deposition 109:11.
[245] Opposition at 39.
[246] Opposition at 8–9, 39–40.
[247] *Emmett v. Armstrong*, 973 F.3d 1127, 1134 (10th Cir. 2020).

did not verbally identify himself as an officer, based on the totality of the circumstances, it was objectively reasonable for the officer to believe the suspect knew he was a police officer.[248] Here, all the officers involved with Mr. Palacios were in uniform.[249] Mr. Palacios also ran close by Officer Fortuna's clearly marked police car, with the lights and siren on; after falling, he turns and appears to look at it.[250] It was reasonable for the officers to believe that Mr. Palacios knew he was being pursued by the police.

Plaintiff also argues that since Mr. Palacios did not wait for the officers around the corners of the building, this shows he was not going to use his gun against them. Based on dispatch reports, the officers believed that Mr. Palacios had just threatened two different groups of people with his gun (it turned out to have been three groups, but the officers only knew about the two at the time).[251] Officer Iversen observed Mr. Palacios retrieve his gun three times after tripping and keeping it with him as he ran from the officers. Officer Fortuna observed Mr. Palacios retrieve the gun at least once and continue to run. A reasonable officer could expect that a person who had just threatened multiple others and is committed to retrieving his gun multiple times does so because he intends to use it. That Mr. Palacios had not ambushed the officers around corners he had already passed does not make the officers' belief that he might yet do so unreasonable.

---

[248] *Id.* at 133–34 (noting that the officer arrived in a marked police vehicle, wearing his uniform, with his patrol car's lights on and flashing).

[249] *See generally* Granary Video; Schneider Video; Fortuna Video; Iversen Video.

[250] Iversen Video at 2:03–2:06.

[251] *See* Radio Dispatch at 0:45–1:33, 3:57–4:51, 5:50–6:00, 12:08–12:55; Iversen Deposition at 124:10–16; Fortuna Deposition at 100:5–14.

Plaintiff also points to the fact that the last shot occurred one second after the other shots. Plaintiff argues that because of this lapse, even if all the other shots were justified, this last shot was excessive.[252] However, the officers continued to fire only as Mr. Palacios was facing them and had his hands in front of him appearing to hold and manipulate the gun, not when his hands were at his side. As Mr. Palacios fell to the ground after being shot, he began to turn over toward the officers.[253] He extended both hands in front of his body at approximately waist level and appeared to grip an object.[254] His hands appeared to be manipulating something.[255] They did not appear to be raising in surrender.[256] His hands remained together around the object for approximately four seconds.[257] This includes the time the last shot was fired.[258] Roughly two to three seconds after the last shot was fired, Mr. Palacios put his left arm down to his side and appeared to lift his upper body.[259] His right hand was still around his waist area.[260] His right hand then fell to his right side.[261] In uninterrupted video, we see an officer approach Mr. Palacios seconds after his hands have dropped, with Mr. Palacios' gun clearly visible on his upper left thigh, the same area where the video shows Mr. Palacios' hands had been only seconds before.[262] As noted earlier, while the video's resolution in the dim light is low, the only way the gun could have gotten to Mr. Palacios' thigh is if he had it in his hand or hands. This shows an intent to

---

[252] *See* Opposition at 35–36.

[253] Granary Video at 0:16–0:18.

[254] *Id.* at 0:20.

[255] *Id.* at 0:20–0:24.

[256] *Id.*

[257] *Id.*

[258] Synchronized Video at 2:27.

[259] Granary Video at 0:24–0:25.

[260] *Id.* at 0:24–0:25.

[261] *Id.* at 0:24–0:26.

[262] *See* Southworth Video 0:01–0:04; *see also* Granary Video at 0:57–1:01.

either shoot the officers or threaten them by pointing the gun at them. And, even the last shot, separated in time by one second, was fired as Mr. Palacios apparently had the gun pointed in the direction of the officers. It is reasonable for an officer to fire at a suspect who the officer reasonably believes is pointing a gun at the officer, especially here where the officers were informed that Mr. Palacios had already threatened others with the gun.[263]

Based on the *Larsen* factors discussed above, the immediate threat of safety factor weighs against a constitutional violation.

### iv.   Mr. Palacios was resisting arrest or attempting to evade arrest.

It is undisputed, and clear from the video and audio evidence, that Mr. Palacios was attempting to evade arrest by flight. Mr. Palacios ignored numerous commands to "show me your hands," "drop it," and "drop the gun."[264] He tripped three times, retrieved his gun, and continued running. This factor weighs against a constitutional violation.

### v.   Conclusion

Based on the totality of the circumstances before the Defendant officers, the relevant *Graham* and *Larsen* factors weigh against a constitutional violation. As a result, Plaintiff has not shown the officers' actions were not objectively reasonable. Accordingly, Plaintiff has not shown a constitutional violation, and Defendants Iversen and Fortuna are entitled to qualified immunity.

### b.   Plaintiff Has Not Shown Defendants Violated a Clearly Established Right.

---

[263] *See Valverde*, 967 F.3d at 1062 ("But waiting to find out what the suspect planned to do with the weapon could be suicide. "); *Wilson v. Meeks*, 52 F.3d 1547, 1549–50 (10th Cir. 1995) *abrogated on other grounds as recognized in Crittenden v. City of Tahlequah*, 786 Fed. App'x 795 (10th Cir. 2019) (stating that "it is hard to imagine that pointing a .357 magnum in any direction would not cause a reasonable police officer to fear for someone's life—if not his own, then the life of a bystander or the gunman himself").

[264] *See generally*, Iversen Video; Fortuna Video; Schneider Video.

Even if Plaintiff had established a constitutional violation, the officers would still be entitled to qualified immunity because Plaintiff has not established a violation of a clearly established right. An officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he was doing violates that right. We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."[265] As the Supreme Court has stated, "'clearly established law' should not be defined 'at a high level of generality.' As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case.'"[266] In essence, Plaintiff must point to a Supreme Court, Tenth Circuit case, or the weight of authority from other circuits showing a violation based on facts similar to the ones here, such as a suspect ignoring numerous commands to drop the weapon and show his hands, a suspect's previous use of the weapon or threat to use the weapon, and a suspect who has demonstrated a commitment to retrieving a deadly weapon after multiple opportunities to leave it behind. The case need not be identical to the one here, but it must be so similar that "every reasonable officer" would know that his or her actions were unlawful.

Plaintiff points to four cases to show it is clearly established that "excessive force may not be used after a suspect is effectively subdued."[267] First, Plaintiff cites to *Perea v. Baca*.[268]

---

[265] *Ashcroft v. al-Kidd*, 563 U.S. at 741 (cleaned up) (citations omitted).

[266] *White v. Pauly*, -- U.S. --, 137 S. Ct. 548, 552 (2017).

[267] Opposition at 23. Plaintiff also argues that Officers Iversen and Fortuna "acknowledged that shooting a suspect after he is incapacitated or subdued can be a violation of 'clearly established' law.'" Opposition at 29. As is discussed below, the facts of this case are not sufficiently similar to those involving a "subdued" suspect. So, the officers' acknowledgment of the case law on subdued suspects does not support Plaintiff's argument.

[268] 817 F.3d 1198, 1204 (10th Cir. 2016).

There, the Tenth Circuit determined it is "clearly established that officers may not continue to use force against a suspect who is effectively subdued."[269] The police performed a welfare check after a mother called worried about her son on "very bad drugs."[270] The officers were informed they were responding to a verbal fight, with no weapons involved, and that the man suffered from mental illness and may have been on drugs.[271] The officers found the man pedaling his bicycle, and he began to pedal faster when he saw the patrol car.[272] The officers used their vehicles to force the man into a parking lot, eventually leading to a foot chase.[273] The officers did not tell the man why they were following him nor did they ask him to stop.[274] The officers tackled the man, and after he began to struggle, tased the man in the chest on "probe" mode.[275] This was ineffective, so the officer put the Taser in "stun" mode, and tased the man nine additional times, "for a total of ten taserings in less than two minutes."[276] Before the taserings stopped, the officers were able to get the man on the ground, "with both officers on top of him, effectively subduing him."[277] The man eventually died as a result of being tased ten times.[278]

That case is not sufficiently similar to the underlying facts here. First, the officers in *Perea* were told the man did not have a weapon. Here, the officers not only received two calls of a suspect threatening individuals with a gun, but also saw the gun in Mr. Palacios' hand. The

---

[269] *Id.*

[270] *Id.* at 1201. A neighbor had also called to report the man was "pacing in his yard, clutching a Bible, and asking forgiveness of a higher power." *Id.*

[271] *Id.*

[272] *Id.*

[273] *Id.*

[274] *Id.*

[275] *Id.*

[276] *Id.*

[277] *Id.*

[278] *Id.*

presence and prior use of a weapon is a crucial fact in determining to use force. Second, the officers in *Perea* did not ask the man to stop. Here, Mr. Palacios ignored multiple commands from the officers. Over the course of about one minute, Mr. Palacios fled from the police and ignored repeated commands to drop the gun. Third, the officers in *Perea* were able to subdue the man. Here, even after falling to the ground, Mr. Palacios turned to face the officers, apparently with the gun in his hands. His hands were still together in a manner consistent with pointing and manipulating a gun toward the officers. In *Perea*, the officers were sitting on top of the man. Here, the officers were ten to fifteen feet away. In short, Mr. Palacios was not effectively subdued. So, *Perea* would not have put every reasonable officer on notice that the actions in this case were unlawful.

Second, Plaintiff points to *Fancher v. Barrientos*.[279] There, an officer responded to a theft of beer from a mercantile.[280] There was no report the suspects were armed or threatening.[281] The officer responded to the mercantile, interviewed a clerk, and viewed surveillance video showing two men, one of whom the clerk identified.[282] After eventually discovering three suspects, the officer ordered them to lie down. One suspect approached the officer, lunged at him, and grabbed the officer's duty weapon with both hands. As the two struggled and fell to the ground, the officer's gun discharged on the ground and malfunctioned. The suspect continued to attempt to take the gun from the officer. The officer attempted to tase the suspect, but it did not work. The suspect then ran to the officer's patrol car, which contained two loaded guns. At the same time,

---

[279] 723 F.3d 1191 (10th Cir. 2013).
[280] *Id.* at 1194.
[281] *Id.*
[282] *Id.*

the officer retrieved his weapon from the ground and cleared the malfunction. He followed the suspect to his patrol car, trying to remove the key and shouting for the suspect to get out of the vehicle. The suspect shifted the car into reverse. The officer fired his weapon at the suspect's chest and was sure he had hit him as he saw the suspect "slump."[283] The car then began "pushing him away" and continued in reverse away from the officer. [284] The officer continued to shoot at the suspect "even though he did not have any indication that [the man] was armed." [285] The officer fired a total of seven shots, within a period of five to seven seconds between the first and remaining six shots.[286]

The officer fired six shots at the suspect who was "no longer able to control the vehicle, to escape, or to fire a long gun, and thus, may no longer have presented a danger to the public."[287] The Tenth Circuit noted that it had "no trouble concluding [the officer] lacked probable cause to believe [the suspect] posed a threat of serious harm to [the officer] or others at the time he fired shots two through seven."[288] *Fancher* is not factually similar to the circumstances of this case. Quite opposite to the suspect in *Fancher* who did not have a weapon and posed no immediate threat, Mr. Palacios had threatened others with his gun, was armed when the officers encountered him, and appeared to point his gun at the officers as he was on the ground. He was not subdued. *Fancher* does not show that the officers' actions against Mr. Palacios violated clearly established law.

---

[283] *Id.* at 1197.

[284] *Id.*

[285] *Id.*

[286] *Id.* at 1194–96.

[287] *Id.* at 1201.

[288] *Id.*

Third, Plaintiff cites to *Estate of Smart*[289] as support that officers are not to use deadly force on an individual who has been subdued. Again, the video evidence shows that Mr. Palacios was not subdued. Where the man in *Smart* was shot three times while on the ground, without a weapon, Mr. Palacios was shot as he was facing officers with his hands together while appearing to hold a gun, which the officers had previously seen in his hand.[290] In *Smart*, there was conflicting evidence as to whether the man had or was holding a gun.[291] Here, the undisputed evidence shows that Mr. Palacios had a gun, the officers knew he had a gun, the officers believed Mr. Palacios had threatened multiple people with his gun, and Mr. Palacios appeared to point the gun at the officers after he fell to the ground while being shot.[292] *Estate of Smart* would not inform every reasonable officer that the actions in this case were clearly unlawful.

Fourth, Plaintiff cites to *Reavis* for the proposition that deadly force is unreasonable when a reasonable officer would have perceived the threat had passed.[293] In *Reavis*, a deputy shot a man after the man accelerated his truck forward toward a deputy, the deputy moved out of the way, and the truck went around the deputy, passing within inches of him.[294] The deputy did not fire at the vehicle until the side mirror passed him, firing five to seven times as the vehicle passed.[295] The deputy fired at the suspect from "behind and to the side."[296] The Tenth Circuit

---

[289] 951 F.3d 1161 (10th Cir. 2020).

[290] *See* Granary Video at 0:15–0:25; Fortuna Video at 1:20–1:30; Iversen Video at 2:12–2:22; Schneider Video at 4:54–5:04.

[291] 951 F.3d at 1170–71.

[292] *See* Granary Video at 0:15–0:25; Fortuna Video at 1:20–1:30; Iversen Video at 2:12–2:22; Schneider Video at 4:54–5:04.

[293] *Reavis*, 967 F.3d at 989; Opposition at 26–27.

[294] *Reavis*, 967 F.3d at 983.

[295] *Id.*

[296] *Id.* at 987 (citing record).

affirmed the district court finding that the suspect did not pose an immediate threat to the deputy or others.[297] And as the Tenth Circuit made clear, "While the district court focused its analysis on whether [the deputy] was in danger at the precise moment that he used force against [the suspect], it did so in the context of the totality of the circumstances."[298] The officer had jumped out of the way and did not fire until the vehicle had passed him.[299]

This case is not like *Reavis*. Here, the officers were informed that Mr. Palacios had just threatened multiple others with his gun. They knew that Mr. Palacios had not responded to numerous orders to drop the gun and show his hands. They also knew that Mr. Palacios repeatedly retrieved the gun, showing his commitment to it. And even after the initial shots, the officers reasonably believed that Mr. Palacios still posed a threat when they saw him appear to point the gun towards them.[300] *Reavis* does not put the legality of the officers' actions here "beyond debate."[301]

Plaintiff also points to one case from the Sixth Circuit finding that officers cannot use "unreasonable deadly force" or "gratuitous violence."[302] Plaintiff cannot rely on this case to meet the clearly established prong as it is not from the Supreme Court, the Tenth Circuit, or the weight of authority from other courts.[303] But even if this court could rely on *Margeson* to establish a

---

[297] *Id.* 988–92.

[298] *Id.* at 989.

[299] *Id.* at 990.

[300] *See* Iversen Deposition at 124:10–16; Fortuna Deposition at 111:21–112:21; *see also* Granary Video at 0:16–0:24.

[301] *Ashcroft v. al-Kidd*, 563 U.S. at 741.

[302] Opposition at 27 (citing *Margeson v. White Cnty. Tenn.*, 579 Fed. App'x 466 (6th Cir. 2014).

[303] *See Valverde*, 967 F.3d at 1067 ("[T]he plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." (citation omitted)).

clearly established right, that case is insufficiently similar. There, a woman reported the erratic behavior of her son who had a warrant out for his arrest and was carrying firearms with him.[304] Police came to execute the warrant and surrounded the house.[305] The man's wife warned the man the police were there, and he "grabbed his guns."[306] The officers ordered the man to drop the gun, and he refused. One officer saw the man coming through the front door of the house with a rifle pointed at the officer, so the officer fired a shot. Another officer next to the officer who shot, heard the shot and also started firing. A third officer started shooting toward the door as well. While the two officers were still firing, an officer charged towards the door, and saw the man fall to the floor and come up with a handgun. One officer stopped shooting for a moment, but then continued firing after the officer who charged the door retreated.[307] Over forty shots were fired in the home and at the man.[308]

The district court denied summary judgment in part because there was a "genuine factual issue as to whether the amount of force used was necessary or reasonable, given the dispute over the number of shots fired, and whether the Officers continued to fire at [the man] after he no longer posed a reasonable threat."[309] The officers offered no explanation as to why they fired so many shots, and it was "entirely unclear" whether two officers who had "done most of the shooting after the initial round of shots" even saw a gun or perceived any threat after the man had been shot to the ground.[310] There was no video evidence of the shooting. The Sixth Circuit

---

[304] *Margeson*, 579 Fed. App'x at 467.
[305] *Id.* at 468.
[306] *Id.*
[307] *Id.*
[308] *Id.* at 469.
[309] *Id.* at 468–69.
[310] *Id.* at 472.

noted that it did not "intend to suggest that any number of shots is categorically reasonable or unreasonable; our reasonableness analysis hinges on the *totality* of the circumstances."[311]

The case at bar is very different. Here, the officers continued to shoot at Mr. Palacios as long as he was a threat, specifically while he turned toward them appearing to point the gun at them.[312] Also, unlike the officers in *Margeson*, both Officers Iversen and Fortuna testified that they fired until they thought the threat was abated.[313] Unlike in *Margeson*, it is also undisputed that both Officers Iversen and Fortuna saw Mr. Palacios with a gun.[314] Finally, unlike in *Margeson*, there is video evidence that shows what happened. So even if a single out-of-circuit case could meet the standard, *Margeson* would be too different factually to do so.

Next, Plaintiff argues it was clearly established "that use of deadly force to prevent the escape of all felony suspects is constitutionally unreasonable."[315] While Plaintiff refers to clearly established law, this section actually appears to address the constitutional violation prong and mentions some of the *Graham* factors; it does not argue that any cases are factually similar and show it was clearly established that the officers' actions were unlawful. Even if this was intended as an argument to address the clearly established prong, a string cite of various cases with no argument or factual comparison is facially insufficient.[316]

None of the cases Plaintiff has cited are similar enough to the facts of this case to show that "every reasonable officer"[317] would know their actions were unlawful. Accordingly,

---

[311] *Id.*

[312] *See* Synchronized Video at 2:20–2:31.

[313] *See* Iversen Deposition at 148: 9–10; *see also* Fortuna Deposition at 114:18–115:22.

[314] *See* Iversen Video at 2:10–2:12: Fortuna Video at 1:19–21; Fortuna Deposition at 89:13–15, 91:16–22.

[315] Opposition at 37–39.

[316] *See id.*

[317] *See Ashcroft v. al-Kidd*, 563 U.S. at 741.

Plaintiff has not identified any case law from the Supreme Court, Tenth Circuit, or the weight of authority from other circuits showing that the shooting officers violated a clearly established right. Plaintiff has failed to meet the "clearly established" prong of qualified immunity. Based on this failure, Defendants Iversen and Fortuna are entitled to qualified immunity as to the claims brought against them.

### c. Salt Lake City Corporation is entitled to judgment on the § 1983 claims.

"A municipality may not be held liable where there was no underlying constitutional violation by any of its officers."[318] As previously noted, no constitutional violation occurred. Therefore, Defendant Salt Lake City is entitled to judgment on the § 1983 claims.

## II.   Defendants Are Entitled to Judgment on Plaintiff's State Constitutional Claims.

The Utah Supreme Court has stated that "the Utah Code does not include a statute akin to 42 U.S.C. § 1983. As a result, a plaintiff's remedy for state constitutional violations rests in the common law."[319] In order to recover for violations of the Utah constitution, the plaintiff "must clear two hurdles."[320] First, the "plaintiff must prove that the constitutional provision violated is 'selfexecuting.'"[321] Second the plaintiff has to meet three elements: (1) a "flagrant violation" of his or her constitutional rights; (2) "existing remedies do not redress his or her injuries;" and (3) "equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's right or redress his or her injuries."[322]

---

[318] *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993). Plaintiff concedes that if the § 1983 claim against the officers fails, "then Plaintiff's '*Monell* claims' against SLC are [sic] would also fail." Opposition at 22 n.2.

[319] *Jensen ex rel. Jensen v. Cunningham*, 250 P.3d 465, 480 (Utah 2011).

[320] *Id.* at 481.

[321] *Id.*

[322] *Id.* (citations omitted).

Plaintiff brings two claims under the Utah Constitution: (1) violation of Article I, Section 9 (cruel and unusual punishment) and (2) violation of Article I, Section 14 (unreasonable search and seizure).[323] Plaintiff's state constitutional claims do not meet the legal standard for a "flagrant violation" under Utah law. The Utah Supreme Court has stated that a flagrant violation, "is not satisfied unless the conduct violates clearly established constitutional rights of which a reasonable person would have known."[324] The court further stated that a "right is not clearly established unless its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right."[325]

As discussed previously, it was not clearly established that every reasonable officer would understand the actions here violated the law. Because there was no flagrant violation, the Utah constitutional claims fail as a matter of law. Furthermore, Plaintiff does not address Defendants' arguments regarding the Utah constitutional claims in opposition, thereby conceding them.[326]

## CONCLUSION

The loss of human life is tragic. But the question for the court is whether, viewed in the light most favorable to Plaintiff, the facts can support a finding that the defendant officers violated Mr. Palacios' constitutional rights and are not entitled to qualified immunity.

---

[323] Complaint at ¶¶ 90–100.

[324] *Jensen*, 250 P.3d at 482 (internal quotation marks and citations omitted).

[325] *Id.*

[326] *See generally*, Opposition. Plaintiff's only reference to the Utah constitutional claims is in a footnote. Opposition at 22, n.3. That footnote, inserted in a discussion of the § 1983 claim, argues that the state claims are supported by the fact that Mr. Palacios' body remained shirtless and uncovered in a parking lot, constituting inhumane treatment. *Id.* But Plaintiff cites no Utah law to address the legal standard for a constitutional violation and fails to respond to any of Defendants' arguments on this issue. This is insufficient.

Considered together instead of piecemeal, the video and audio evidence are clear. Here, police officers quickly responded to reports of two suspects—one of whom turned out to be Mr. Palacios—who had just threatened multiple people with a gun. When the officers encountered Mr. Palacios, he ignored at least ten orders to drop his gun and show his hands, choosing to run with the gun instead. Three times Mr. Palacios fell and lost his hold on the gun; three times he picked the gun up immediately and continued to refuse the officers' commands.

Having heard that Mr. Palacios had only a few minutes earlier threatened multiple other people with his gun and having seen his commitment to retrieving the gun, the shooting officers reasonably believed that Mr. Palacios was an immediate threat to their safety and to any member of the public he might encounter during the chase. After the officers shot him, Mr. Palacios immediately rolled from his side onto his back, appeared to raise his gun with his right hand, bring both hands together on the gun, and point it in the general direction of the officers while manipulating it. The officers continued to fire and stopped a moment before Mr. Palacios dropped his gun onto his upper left thigh and his hands dropped to his sides. The officers then slowly approached Mr. Palacios and kicked the gun off his thigh and away from him.

On these facts and the others discussed earlier, Defendants did not violate Mr. Palacios' constitutional rights, and the individual officers are entitled to qualified immunity.

# ORDER

For the reasons stated in this Memorandum Decision and Order, Defendants' motion for summary judgment[327] on all remaining claims is granted.

Signed February 28, 2022.

BY THE COURT

_____
David Barlow
United States District Judge

---

[327] ECF No. 29, filed September 8, 2021.